| B 104 (Rev. 2/92) | **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) 01-5080 |
|---|---|---|
| **PLAINTIFFS** SOVEREIGN BANK | **DEFENDANTS** MARSHALL AND MARCIA JABLON | |
| **ATTORNEYS** (Firm Name, Address, and Telephone No.) Weir & Partners LLP Suite 500, The Widener Building, 1339 Chestnut St. Philadelphia, PA  19107 (215) 665-8181 | **ATTORNEYS** (If Known) | |

**PARTY** (Check one box only)   ☐ 1 U.S. PLAINTIFF   ☐ 2 U.S. DEFENDANT   ■ 3 U.S. NOT A PARTY

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Claim objecting to discharge of the Debtors pursuant to §727(a)(2)(A), §727(a)(3) and §727(a)(5) objecting to dischargeability of debt pursuant to §523(a)(2)(B) and §523(a)(6).

**NATURE OF SUIT**
(Check the one most appropriate box only.)

- ☐ 454 To Recover Money or Property
- ☐ 435 To Determine Validity, Priority, or Extent of a Lien or Other Interest in Property
- ☐ 458 To obtain approval for the sale of both the interest of the estate and of a co-owner in property
- ■ 424 To object or to revoke a discharge 11 U.S.C. §727
- ☐ 455 To revoke an order of confirmation of a Chap. 11, Chap. 12, or Chap. 13 Plan
- ☐ 426 To determine the dischargeability of a debt 11 U.S.C. §523
- ☐ 434 To obtain an injunction or other equitable relief
- ☐ 457 To subordinate any allowed claim or interest except where such subordination is provided in a plan
- ☐ 456 To obtain a declaratory judgment relating to any of foregoing causes of action
- ☐ 459 To determine a claim or cause of action removed to a bankruptcy court
- ☐ 498 Other (specify)

| **ORIGIN OF PROCEEDINGS** (Check one box only.) | ■ 1 Original Proceeding | ☐ 2 Removed Proceeding | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another Bankruptcy Court | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 |
|---|---|---|---|---|---|
| **DEMAND** | NEAREST THOUSAND $ | OTHER RELIEF SOUGHT denial of discharge of debtors and denial of dischargeability of debt | | | ☐ JURY DEMAND |

**BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES**

| NAME OF DEBTOR In re Marshall and Marcia Jablon | BANKRUPTCY CASE NO. 01-12191 | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING Southern District of NY | DIVISIONAL OFFICE White Plains | NAME OF JUDGE Hardin |

**RELATED ADVERSARY PROCEEDING (IF ANY)**

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| DISTRICT | DIVISIONAL OFFICE | NAME OF JUDGE |

| **FILING FEE** (Check one box only.) | ■ FEE ATTACHED | ☐ FEE NOT REQUIRED | ☐ FEE IS DEFERRED |
|---|---|---|---|
| DATE 10/1/01 | PRINT NAME Tina L. Colman, Esquire | SIGNATURE OF ATTORNEY (OR PLAINTIFF) | |

UNITED STATES BANKRUPTCY COURT      01/50804
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X
In Re:                                  Chapter 7

MARSHALL AND MARCIA JABLON              Index No. 01-12191

        Debtors.

------------------------------------------------X

SOVEREIGN BANK

        Plaintiff
                                        Adversary No.
v.

MARSHALL AND MARCIA JABLON

        Defendants

------------------------------------------------X

### COMPLAINT OBJECTING TO DISCHARGE PURSUANT TO
### 11 U.S.C. §727 AND DISCHARGE ABILITY PURSUANT TO 11 U.S.C. §523

Plaintiff, Sovereign Bank, by its attorneys, Weir & Partners LLP, hereby files this complaint to object to discharge pursuant to §§ 727(a)(2)(A) and (a)(3) and to object to dischargeability of a debt pursuant to §§ 523 (a)(2)(B) and (a)(6) and of the Bankruptcy Code and in support thereof avers the following:

### PARTIES AND JURISIDICTION

1.    Plaintiff, Sovereign Bank (the "Bank"), is a federally chartered savings bank and successor in interest to TS Business Finance Corporation with a place of business located at 6000 West Lincoln Drive, Marlton, New Jersey 08053.

2.  Defendants, Marshall Jablon and Marcia Jablon, husband and wife (sometimes collectively, the "Jablons" or the "Debtors"), are adult individuals residing at 400 Mamaroneck Avenue, Harrison, New York.

3.  On April 13, 2001 (the "Filing Date"), the Debtors filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §101 et seq. at the above caption (the "Chapter 7 Case"). An Order for Relief was entered simultaneously therewith.

4.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C §157 and §1334, and 11 U.S.C. § 523 and §727.

5.  This matter is a core proceeding under 28 U.S.C. §157 (B)(2)(I) and (B)(2)(J).

## BACKGROUND FACTS

6.  At all times relevant hereto, Marshall Jablon was a shareholder, director and the President of Federal Financial Group, Inc. ("FFG").

7.  At all times relevant hereto, Marcia Jablon was a shareholder, director, Chief Operating Officer, Executive Vice President and Secretary of FFG.

8.  At all times relevant hereto, FFG was engaged in the factoring business. In the course of its business, FFG routinely entered into factoring agreements with its clients pursuant to which FFG agreed to purchase on an ongoing basis, but at a discounted rate, assignments of the outstanding accounts receivable of its client, i.e., the amounts owed to the client from the purchasers of its products.

9.  These accounts receivable were reflected by individual invoices which the client submitted to FFG and FFG, in turn, advanced money to the client based on the individual invoices.

10. Pursuant to the terms of each factoring agreement, FFG's client's customer was directed to make payment on the invoice directly to FFG. Upon receipt of payment, FFG reimbursed itself for the advance made to the client, deducted certain fees and remitted the balance to the client.

11. At all times relevant hereto, the Jablons were in control of FFG and ran the daily operations of FFG.

12. FFG's internal policies and procedures required FFG to verify each invoice on which FFG was advancing funds.

13. As the officers and directors of FFG, the Jablons were charged with the responsibility of ensuring that the invoices which FFG financed represented legitimate obligations owed to FFG's clients. The Jablons were also responsible for ensuring that FFG employees followed the policies and procedures of FFG.

14. At all times relevant to this Complaint, FFG's business was financed through a line of credit extended by the Bank (the "Line of Credit") and negotiated by the Jablons.

15. At all times, the Jablons were keenly aware of and intimately familiar with the terms of the lending relationship between the Bank and FFG.

16. As security for the Line of Credit, the Jablons caused FFG to grant to the Bank a first lien security interest in all of FFG's assets, including a security interest in all of the invoices purchased by FFG and all payments received thereon.

17. As additional security for the Line of Credit, the Jablons executed and delivered to the Bank their personal guaranties.

18. FFG's business was structured so that all income from its factoring business was to be deposited in a lockbox account maintained at First Union National Bank (or its predecessor, CoreStates Bank, N.A.).

19. Pursuant to the loan agreement between FFG and the Bank (the "Loan Agreement"), the lockbox account was to be swept each day and the funds transferred to the Bank. The Bank applied the receipts to reduce the Line of Credit.

20. FFG was able to fund its purchases of invoices from its clients only by drawing on the Line of Credit. At the same time, FFG was able to receive continuous funding of its business through the Line of Credit only by continuing to purchase invoices from its factoring clients.

21. Pursuant to the terms of the Loan Agreement, FFG was obligated to provide to the Bank, on a regular basis, certain financial information and documentation regarding its purchases of invoices and the payments thereupon including, but not limited to, the total dollar value of purchased invoices, the total value of invoices purchased from individual factoring customers of FFG, the payment status of those invoices (i.e whether payments were overdue and if so, for by how long), and the total amounts received in payment on purchased invoices.

22. The Jablons, as officers of FFG, were responsible for ensuring that the Bank received accurate and timely financial information from FFG. The Bank would continue to provide funding under the Line of Credit only if the Jablons provided the information required by the Loan Agreement and only if that information met certain standards which were set forth in the Loan Agreement.

23. Pursuant to the Loan Agreement, funds availability under the Line of Credit was also contingent upon FFG obtaining and preserving full title to the invoices that it purchased and taking all steps necessary to see that such invoices were <u>paid directly</u> to FFG.

24. One of FFG's largest clients was Aldo Coutures, Ltd., d/b/a Aldo Coutures, Inc. ("Aldo Coutures"). Aldo Coutures was, at all relevant times, owned by Aldo Diez ("Diez"). Diez also owned Aldo NY, Inc., Aldo Studio, Inc., Antarctica, Ltd. and A & S Napiel, Ltd. (the "Diez Entities").

25. On March 31, 1998, Aldo Coutures entered into a factoring agreement with FFG (the "Aldo Factoring Agreement") under the terms of which FFG agreed to purchased, at it discretion and subject to certain conditions set out in the Aldo Factoring Agreement, assignments of certain Aldo Coutures invoices (the "Invoices") for 70% of their face value.

26. The terms of the Aldo Factoring Agreement were negotiated by the Jablons.

27. Marcia Jablon was the account executive for the Aldo Coutures account and the person charged with the direct responsibility for the account.

28. Upon the assignment of the Invoices to FFG, the Invoices immediately became the property of FFG and all payments by Aldo Coutures' customers on such invoices were owed to and to be paid directly to FFG at its lockbox.

29. Aldo Coutures, Diez and the Jablons knowingly and intentionally engaged in a scheme designed to defraud the Bank by fraudulently inflating the value of the Aldo Coutures receivables in order to obtain financing from the Bank.

30. Rather than FFG receiving payments on the Invoices directly from Aldo Coutures' customers as required by the Factoring Agreement, Aldo Coutures, directly and through the Diez

5

Entities, paid the amounts owed on the Invoices directly to the Jablons. These payments were accepted by the Jablons with their consent and with full knowledge that the method of payment directly violated the terms of the Factoring Agreement.

31. The Jablons failed to disclose to and actively concealed from the Bank the irregularities in the Aldo Coutures' payments.

32. Moreover, the Invoices sold by Aldo Coutures to FFG were fraudulent and did not represent valid debts owed to Aldo Coutures for services rendered or goods sold.

33. FFG's policies and procedures stated that Marcia Jablon, as the account executive, was directly charged with the responsibility for verifying the Invoices.

34. Marcia Jablon did not verify the Invoices. Yet, FFG, at the direction of the Jablons, continued to finance the Invoices.

35. At all relevant times, Aldo Coutures, Diez and the Jablons knew that the Invoices were fraudulent.

36. By causing FFG to advance funds to Aldo Coutures without verifying the Invoices, the Jablons intentionally violated and/or disregarded and/or conspired to violate FFG's internal policies and procedures.

37. As a result of the Jablons' knowing and intentional failure to verify the Invoices and to follow the policies and procedures of FFG, Aldo Coutures was able to continue to receive financing from FFG and FFG's books and records were fraudulently inflated.

38. To conceal their fraudulent scheme, the Jablons knowingly caused FFG's books and records to be falsified.

39. Specifically, the Jablons caused data regarding the payments made by Aldo Coutures and the Diez Entities to be recorded in FFG's books and records as if these payments had been made in the regular course of business, i.e., directly from customers of Aldo Coutures to the lockbox.

40. The Jablons also caused to be entered into FFG's books and records data regarding the verification of the Invoices which falsely reflected that the Invoices were legitimate and had been verified when, in fact, they had not been verified.

41. The Jablons submitted to the Bank financial information from the fraudulent books and records on which additional draws on the Line of Credit were based.

42. As a result of and based on the fraudulent financial information provided to the Bank by the Jablons, the Bank advanced in excess of 4,600,000.00 to FFG as of July, 2000.

43. The Jablons were removed from their positions as officers and directors of FFG in July, 2000.

44. When the Bank attempted to collect the outstanding indebtedness from FFG, the Bank learned that the funds were not in FFG's possession and that FFG did not have any assets cumulatively valued at $4,600,000.00.

45. The Bank has been unable to collect any of the Aldo Coutures receivables appearing on FFG's books and records.

46. Upon information and belief, the Jablons transferred and/or converted the funds received from Aldo Coutures and/or the Diez Entities to themselves or to others to the detriment of FFG, the Bank and FFG's other creditors.

47. The Schedules and Statement of Financial Affairs filed by the Jablons in connection with this bankruptcy proceeding do not reflect any of the money they received from FFG.

## COUNT I

48. The Bank incorporates the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

49. Upon information and belief, the Jablons concealed and continue to conceal funds they received from Aldo Coutures and/or the Diez Entities and caused to be transferred to themselves.

50. Such concealment was made with the intent to hinder, delay or defraud the Bank and the Jablons' other creditors.

51. The concealment of the funds was made within one year before the Filing Date.

52. As the direct result of the willful and unlawful concealment of the property of the Jablons, the Bank has suffered damages in the amount of $5,463,106.76 as of September 28, 2001, plus additional accrued and continuing interest at the per diem rate of $1,435.47, costs of suit and attorneys' fees.

WHEREFORE, the Bank respectfully requests that this Court enter judgment in its favor, and deny a discharge to the Debtors pursuant to 11 U.S.C. §727(a)(2)(A) and for such other and further relief as the Court deems appropriate.

## COUNT II

53. The Bank incorporates the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

54. The Jablons knowingly and intentionally falsified the books and records of FFG from which the true nature of the business transactions with Aldo Coutures might be ascertained.

55. Upon information and belief, the Jablons knowingly and intentionally falsified their financial records to conceal the funds received from FFG.

56. As the direct result of the willful and unlawful falsification of records by the Jablons, the Bank has suffered damages in the amount of $5,463,106.76 as of September 28, 2001, plus additional accrued and continuing interest at the per diem rate of $1,435.47, costs of suit and attorneys' fees.

WHEREFORE, the Bank respectfully requests that this Court enter judgment in its favor, and deny a discharge to the Debtors pursuant to 11 U.S.C. §727(a)(3) and for such other and further relief as the Court deems appropriate.

## COUNT III

57. The Bank incorporates the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

58. The Jablons have failed to explain satisfactorily their loss of the funds received from FFG.

59. The Jablons have failed to explain satisfactorily the deficiency of their assets to meet their liabilities.

60. As the direct result of the willful and unlawful falsification of records by the Jablons, the Bank has suffered damages in the amount of $5,463,106.76 as of September 28, 2001, plus additional accrued and continuing interest at the per diem rate of $1,435.47, costs of suit and attorneys' fees.

WHEREFORE, the Bank respectfully requests that this Court enter judgment in its favor, and deny a discharge to the Debtors pursuant to 11 U.S.C. §727(a)(5) and for such other and further relief as the Court deems appropriate.

## COUNT IV

61. The Bank incorporates the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

62. As officers, directors and shareholders of FFG, the Jablons and FFG are insiders as defined by 11 U.S.C. §101.

63. The Jablons, in their capacity as officers, directors and shareholders of FFG, made written statements to the Bank with respect to the financial condition of FFG.

64. The Jablons, in their capacity as officers, directors and shareholders of FFG, made written statements to the Bank with respect to the value of Aldo Coutures' Invoices.

65. The statements made by the Jablons to the Bank were materially false.

66. The Bank reasonably relied on the written statements made by the Jablons in extending credit to FFG.

67. The Jablons made the false statements to the Bank with the intent to deceive the Bank.

68. As a direct result of the false statements made by the Jablons to the Bank, the Bank suffered harm.

69. On January 17, 2001, the Bank obtained a judgment against the Jablons for breach of their Guaranties in the amount of $5,036,772.17, plus continuing interest and attorneys fees.

70. The debt owed by the Jablons to the Bank should be excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(B).

WHEREFORE, the Bank respectfully requests that this Court enter judgment in its favor, and except from discharge the debt owed by the Debtors to the Bank pursuant to 11 U.S.C. §523(a)(2)(B) and for such other and further relief as the Court deems appropriate.

## COUNT V

71. The Bank incorporates the allegations contained in the foregoing paragraphs as if fully set forth at length herein.

72. The Jablons willfully and maliciously provided the false and misleading information to the Bank with respect to the authenticity of the Invoices.

73. The Jablons willfully and maliciously provided the false and misleading information to the Bank with respect to the financial condition of FFG and the value of the accounts receivable of FFG.

74. The Jablons provided the false and misleading information to the Bank with the intent and purpose of injuring the Bank.

75. As a direct result of the false information provided by the Jablons to the Bank, the Bank suffered harm.

76. On January 17, 2001, the Bank obtained a judgment against the Jablons for breach of their Guaranties in the amount of $5,036,772.17, plus continuing interest and attorneys fees.

77. The debt owed by the Jablons to the Bank should be excepted from discharge pursuant to 11 U.S.C. §523(a)(6).

WHEREFORE, the Bank respectfully requests that this Court enter judgment in its favor, and except from discharge the debt owed by the Debtors to the Bank pursuant to 11 U.S.C. §523(a)(6) and for such other and further relief as the Court deems appropriate.

WEIR & PARTNERS LLP

By: _____
BONNIE R. GOLUB (BG-1317)
TINA L. COLMAN (TC-3230)
The Widener Bldg., Suite 500
1339 Chestnut Street
Philadelphia, PA 19107
(215) 665-8181

Counsel for Sovereign Bank

Dated: October 1, 2001